**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SPRINT SPECTRUM L.P., et al., | Civil Action No.: 09-4940 (JLL) |
| Plaintiffs, | |
| v. | **OPINION** |
| THE ZONING BOARD OF ADJUSTMENT OF THE BOROUGH OF PARAMUS, NEW JERSEY, | |
| Defendant. | |

**LINARES**, District Judge.

Currently before this Court is a Motion for Summary Judgment filed by Plaintiffs on

April 26, 2010 (CM/ECF No. 14) and a Motion to Strike all or portions of Plaintiffs' reply papers

filed by Defendants on August 6, 2010 (CM/ECF No. 31).  Plaintiffs' Complaint alleges

violations of the Telecommunications Act of 1996 ("TCA") under 47 U.S.C. §§ 332(c)(3)(A),

332(c)(7)(B)(i)(II), 332(c)(7)(B)(ii), and 332(c)(7)(B)(iii) and of the New Jersey Municipal Land

Use Law ("MLUL"), N.J.S.A. 40:55D-1, *et seq.*, seeking declaratory and injunctive relief.

Plaintiffs further seek a declaratory judgment that various of Defendant's actions are preempted

by federal law under the Supremacy Clause of the United States Constitution.  The Court has

reviewed the submissions in support of and in opposition to the present Motions and decides the

matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure.

## I.     BACKGROUND

The facts set forth herein are taken from the parties' Local Civil Rule 56.1 statements

unless otherwise noted.  The following facts are undisputed:

1.     Plaintiffs are proposed lessees of two portions of property located within the
Borough of Paramus, New Jersey.  One, the "Ambulance Corps" site is located at
295 East Midland Avenue.  (Pls.' Stmt. of Facts ¶ 1 [hereinafter "SOF"].)  The
other, "Church of the Nazarene" site, is located at 285 East Midland Avenue.
(SOF ¶ 11.)

2.     Plaintiffs proposed to construct a wireless telecommunications facility at either
the Ambulance Corps site or the Church of the Nazarene site in order to fill an
alleged gap in wireless coverage.  (SOF ¶ 22.)

3.     The Ambulance Corps Site

   a.     Sprint filed an application for zoning variances and approval to construct a
   wireless communications facility at the Ambulance Corps site on or about
   December 2, 2004.  (SOF ¶ 2.)  T-Mobile's predecessor in interest,
   Omnipoint Communications, was added to the application on or about
   August 18, 2008.  (Id. at ¶ 3.)  The Ambulance Corps site is located in an
   R-100 residential zone under the local zoning ordinance.  (Id. at ¶ 6.)  The
   Ambulance Corps site is bordered by a Jewish Community Center, a
   Church of the Nazarene, and four residences.  (Id. at ¶ 7.)

   b.     At the Ambulance Corps site, Plaintiffs proposed to construct a 125-foot
   monopole that was more than 125 feet from the property lines with the
   Jewish Community Center and the residences, but was approximately
   100.8 feet from the property line with the Church's parking lot.  (SOF ¶ 8.)
   The carriers further proposed that an external light be attached to the base
   of the monopole.  (Id. at 9.)

4.     The Church of the Nazarene Site

   a.     Sprint and T-Mobile's predecessor in interest, Omnipoint
   Communications, filed a joint application for zoning variances and
   approval to construct a wireless communications facility on the Church of
   the Nazarene property on or about November 13, 2007.  (SOF ¶ 12.)  The
   property is located with an R-100 residential zone and bordered by the
   Paramus Volunteer Ambulance Corps, a commercial strip, and two
   residences.  (Id. at ¶ 16-17.)

      b.      At the Church of the Nazarene site, Plaintiffs proposed to construct a 120 foot tall tower designed as a faux tree upon which the carriers would mount their antennas. The radio equipment was proposed to be housed at the base of the pole within a fenced compound. (SOF ¶ 15.) The carriers further proposed that an external light be attached to the base of the monopole. (Id. at ¶ 20.)

5.      The Ambulance Corps and Church of the Nazarene site applications both requested variances pursuant to N.J.S.A. 40:55D-70(d) with respect to (a) permitted use, as telecommunications facilities are not a permitted use in a residential zone, and (b) maximum building height, as 32 feet is the maximum height permitted. (SOF ¶ 10.) Both applications further requested variances pursuant N.J.S.A. 40:55D-70(c) with respect to (a) lighting, (b) minimum front/rear setback, (c) minimum setback from a residential zone, and (d) minimum setback from property line for an equipment building. (Id.) Plaintiffs requested that either application be granted. (Id. at ¶ 22.)

6.      The Zoning Board of Adjustment of the Borough of Paramus (the "Board") held seventeen public hearings regarding Plaintiffs' applications over a period from May 26, 2005 to June 25, 2009. (Pls.' Br. Ex. M, at 1 [hereinafter "Board Decision"].) At these meetings, the Board heard testimony from counsel and various experts, and questions and concerns raised by the general public. (Board Decision at 2-5.)

7.      <u>Testimony Regarding the Existence of a Gap in Wireless Coverage</u>

      a.      In 2006, Plaintiffs' expert, radio frequency engineer Rhoan Gordon, testified before the Board as to the methodology used by Plaintiffs to measure the coverage gap. He indicated that Sprint first "modeled the gap with the computer software" but then "went another step and measured the gap" because the computer model was not "sufficient." (SOF ¶ 26.)

      b.      Mr. Gordon testified that in 2004 Sprint hired an independent company to conduct a "drive test" in which an engineer traveled the roads within the suspected coverage gap using "Sprint phones and phones of the other carriers" measuring the actual signal strengths detected by the phones. (SOF ¶ 35.) The engineer then created a coverage map that highlighted in orange areas in which signal strengths are less than -85 dBm[1] and

---

[1]"dBm" is a unit of received signal strength used in radio frequency engineering. It is measured on a logarithmic scale, scaled by a factor of ten, and it references the power of one milliwatt. The logarithmic scale causes signal strength values lower than one milliwatt to be

highlighted in blue areas in which signal strengths greater than -85 dBm. (See Def.'s Opp'n Br. Ex. W.)  The resulting coverage map shows an area of orange surrounded by areas of blue, which according to Mr. Gordon indicated a gap in coverage.  He testified that:

> The gap runs from River Edge Road to Route 4 in a north/south direction, approximately 2.6 miles.  So we're from north to south, the gap is extensive.  It is intermittent in the south portion.  There are areas of coverage when you can see that the gap itself continues throughout.  It touches beyond Route 4.  So that's approximately 2.6 miles on this.  The distance that I measured, does not go beyond the boundary.  So 2.6 miles within the borough itself.  On Midland Avenue from east to west the gap runs from Farview to Summit Avenue and it is approximately 1.3 miles.  Along Spring Valley Road, more to the south, the gap is approximately 2.2 miles.

(SOF ¶ 25.)

c.    Mr. Gordon testified that the -85 dBm service criterion "provides reliable coverage within your vehicles, with certain homes, wood frame structures."  (Tr. of Zoning Board Hr'g May 11, 2006, 91:1-4.)

d.    Ross Sorci, an independent expert and radio systems engineer hired by the Board, testified in 2008 that "[t]he methodology that [the Carriers] used to evaluate the service gap is pretty much the industry standard, it's the same methodology I've seen used by Sprint and Omnipoint at other locations, as well as other carriers."  (SOF ¶ 35.)  Mr. Sorci concluded from the data presented by the carriers that there is "a real gap in service that [the Carriers are] trying to fill with the proposed facility."  (Id. at ¶ 33.)  He stated that "the drive test data as well as the radio coverage plots show the service gap."  (Id.)

e.    Plaintiffs' expert, electrical engineer Glenn Pierson, testified that the extent of the coverage gap "is considered significant.  There are many – there are about 11,000 people that live in this gap that we can resolve."  (SOF ¶ 40.)  He explained that "15,000 cars a day [travel] on Forest Avenue and Midland Avenue" and continued, "You have the schools here. You have places of gathering.  It's significant.  If it was just a cul-de-sac out in western Pennsylvania somewhere, no, you are not going to cover everything.  But we're talking about inside the core of the most densely populated state."  (Id.)

---

expressed as negative numbers, as here.

f.     The Board's decision cited Mr. Sorci's testimony as finding "a legitimate gap in service that the Applicants are trying to fill."  (Board Decision ¶ 5.)

g.     The Borough's Planner, Brigette Bogart, testified that Plaintiffs "have to identify if there is any significant gap.  I think that's been answered." (SOF ¶ 37.)

8.     <u>Consideration of Alternative Sites</u>

a.     Mr. Sorci testified:

> The applicant has looked at numerous alternative locations, they've evaluated them and rejected them for various reasons.  Some were not available due to Green Acres, some were, you know, low-elevation rooftops, some had zoning restrictions.  In the end, none of these sites was a viable alternative to the church site, none of them will provide the same service.  Some of these alternatives included the high school, the library complex, the Borough Hall area, the Jewish Community Center across the street, the Riverdale High School, Oradell Swim Club, the athletic field adjacent to the swim club, the cemetery, the golf club, and now we've looked at the Unitarian Church and you'll see that these locations, for whatever reason, you know, the building rooftop heights, the ground elevation of the site or just the location of it, really do not lend themselves as a viable alternative, so we keep coming back to the location where we're at.

(SOF ¶ 59.)

b.     In a memorandum submitted to the Board, Plaintiffs listed twenty-seven alternative sites that they had evaluated.  (Id. at  ¶ 55; Pls.' Br. Ex. L.)

9.     <u>Consideration of Alternative Technologies</u>

a.     Mr. Gordon testified as to why the 120 foot monopole was proposed:

> The height selected was determined by several factors.  The extent of the gap that is the area that's required to be covered.  That's a factor in determining height.  The topography is a factor. To the east and the west, the lines determine the height of the tower, the cluster or the trees.  I stated previously, a proper designed wireless facility for PCS or Cingular Communications will be at a very minimum above the cluster.  If you're below the

> tree line, the trees obstruct you, and the signal does not propagate
> that far.  At the very minimum, you will have to clear the trees.  An
> average building height in this area, the trees dominate.  We had
> members of the public, who all have come in and indicated that.
> Yes, there are trees in the vicinity of the gap that are in excess of
> 70, 80 feet that immediately tell us, we have to have the antennas
> higher than those tree heights.

(SOF ¶ 99.)

b.      Mr. Gordon was asked whether affixing antennae to multiple shorter
        structures, such as lamp poles, would be a feasible alternative to the
        monopole design.  He responded:

> That is not a feasible design even if we were to hang them on light
> bulbs, you need a huge box with each antennae system where
> would you put it on the ground, hang it off the light pole and you
> have this huge cabinet or box of some sort hanging on your light
> pole and there would be a lot of them, in order to provide the
> coverage for all of the gap, or a large portion of the gap. . . . You
> need additional height for this facility."

(SOF  ¶ 99.)

c.      At a Board meeting held July 10, 2008, a member of the public inquired as
        to whether a Distributed Antenna System (DAS) had been considered as
        an alternative to the proposed monopole.  (SOF ¶ 100.)

d.      DAS is a means of providing wireless coverage without the use of large
        monopoles.  Whereas a monopole concentrates all wireless antennas onto
        a single tower, DAS distributes those antennas across utility poles and
        other existing structures throughout the coverage area.  (SOF ¶ 113.)  The
        distributed antennas are then interconnected using fiberoptic or coaxial
        cabling.  (Id.)

e.      Mr. Sorci indicated that DAS "is used in areas like tunnels, bridges and
        buildings, parking garages, more like a campus setting.  They're generally
        not very applicable to covering a large area like what we're talking about
        here."  (SOF ¶ 113.)  He described the DAS as a "spot solution."  (Id.)

f.      In November 2008 the Borough hired a public advocate, Patrick Papalia,
        who in turn retained David Maxson as an expert in "wireless consulting
        and communications."  (SOF ¶ 101, 107.)

g.     At a zoning board meeting held February 12, 2009, Mr. Maxson testified that he has served as a consultant to various municipalities for over 20 years and has advised wireless carriers regarding both DAS and monopole technology.  (SOF ¶ 106.)  He testified that he has written technical documents and papers regarding wireless technology, and that he has held various engineering positions and is a "senior member of the Institute of Electrical and Electronics Engineers" and a "certified engineer with the Society of Broadcast Engineers."  (Feb. 12, 2009 Tr. 10:1-20, 7:5-20.)

h.     Mr. Maxson testified that he does not hold a degree in engineering and affirmed that he has "no formal training with respect to the placement, construction or modification of personal wireless facilities."  (SOF ¶ 105.)

i.     The Board permitted Mr. Maxson to testify over the objection of Plaintiffs' counsel.  (SOF ¶ 107.)

j.     Mr. Maxson offered both a written report and oral testimony to the Board regarding the feasibility of using a DAS to fill the coverage gap.  (SOF ¶ 108, 112.)

k.     Mr. Maxson testified that the streets of Paramus are "well populated with utility poles and the density of development is pretty substantial."  He continued:

> So the simple observation from someone who has seen numerous DAS facilities, I've done coverage analysis of DAS antenna nodes, both on computer and in the field, is that as long as you have utility poles going through the neighborhoods, you have an opportunity to provide a coverage footprint wherever you need it.  And, in fact, the testimony of Mr. Gordon early in the process was that it would take about 12, perhaps 15, 30-foot high antennas to fill what they call the gap.

(SOF ¶ 114.)

l.     In his report, Mr. Maxson wrote:

> Mr. Gordon explained that it might take about a dozen sites with 30 ft high antennas to serve the targeted area of Paramus Utility poles are typically about 30 feet, or more, high.  In dismissing this approach, Mr. Gordon explained that "there would be a huge box" at each utility pole.  In my opinion, this is a mischaracterization.
>
> Mr. Sorci did allow that with a DAS architecture using lower

height antennas, "you'd have to have numerous antennas up and down the road to get the same service that we could get from a single structure." Indeed, the use of numerous antennas on utility poles is a requirement for a DAS solution.

(SOF ¶ 111.)

m.    Mr. Maxson testified that his opinion regarding the capability of the DAS to fill the alleged coverage gap was "based on the verbal descriptions in the testimony of the approximate area of the gap that Sprint described, and it's based on testimony of the RF experts speaking on behalf of Sprint." (SOF ¶ 115.)

n.    Plaintiffs' expert, Mr. Pierson testified before the Board in May 2009 that he has "background, training or experience with respect to DAS systems or distributed antenna networks" and has "designed a DAS network." (SOF ¶ 117.)

o.    Mr. Pierson testified as to the reliability of the DAS. He testified that because each DAS node is serially connected, if "you have a break, a tree falls down, ice storm, car hits a pole, takes it down, if it breaks the link, everything past there is gone. So, if you break a link, you could lose all of them." (SOF ¶ 119.) He also testified that while "standard cell sites" have battery backups, he was not aware of any DAS nodes with battery backup. (Id. at ¶ 119.)

p.    Mr. Pierson testified that due to the distributed nature of the DAS, triangulation of a user's location is only accurate to a "thousand foot radius," meaning that first responders to an emergency "might be looking an awful long time" for the source of a user's signal. (SOF ¶ 121.)

q.    Mr. Pierson testified as to various maintenance and worker safety concerns associated with the DAS, noting the potential for electromagnetic radiation exposure. (SOF ¶ 122-23.)

r.    Mr. Pierson testified that the DAS is more difficult to optimize for use by multiple carriers than the monopole design, due to its "omni antenna" architecture. (SOF ¶ 124.)

s.    Mr. Pierson testified that "capacity is not necessarily an issue with DAS. You can add channels to it." (SOF ¶ 125.)

t.    Mr. Pierson testified as to interference issues associated with the DAS, due to the close proximity of different carriers' collocated antennae. (SOF ¶

126-27.)

u.   Mr. Pierson testified as to various technical problems associated with collocating multiple carriers onto a single DAS node.  He testified that while collocation on a monopole requires only the addition of shelters on the ground or antennas to the tower, collocation on a DAS gets "very complicated" due to power and frequency constraints.  (SOF ¶ 129.)

v.   Mr. Pierson testified that "DAS is generally more expensive because your equipment costs range between $7,000 and $20,000 per node," in addition to maintenance and lease costs.  (SOF ¶ 128.)

w.   Mr. Pierson concluded, "I don't think [DAS is] a good solution for an area such as this in trying to get all the multiple providers and get something that's reliable."  (SOF ¶ 131.)

10.   <u>The Zoning Board's Decision</u>

a.   On August 27, 2009, the Board issued a decision denying both of Plaintiffs' applications.  (<u>See</u> Board Decision at p.18.)

b.   The Board made the following findings with respect to both the applications under N.J.S.A. 40:55D-70(c) and the applications under N.J.S.A. 40:55D-70(d)[2]:

i.   Visual Impact: "the substantial height of the proposed monopole and its placement within a residential neighborhood would have a detrimental visual effect on the surrounding properties." (Board Decision ¶ 11.)

ii.   Coverage Gap: "Applicant failed to present evidence that the area is not being served by another wireless carrier."  (<u>Id.</u> at ¶ 12.)

iii.   Investigation of Less Intrusive Means: "Applicant failed to investigate other less intrusive ways of providing coverage." (<u>Id.</u> at ¶ 13.)  "Applicant did not put forth a good faith effort to explore

_____

[2]The Court interprets paragraph 21 of the Board's decision as incorporating the Board's findings under N.J.S.A. 40:55D-70(c) into its analysis under N.J.S.A. 40:55D-70(d).  Paragraph 21 repeats the Board's conclusions under subsection (c) before making the additional conclusion that Plaintiffs "further failed to demonstrate that special reasons exist for" relief under subsection (d).  (Board Decision ¶ 21.)  Thus, the Board appears to have used its findings under subsection (c) to support its conclusions under subsection (d).

and investigate alternative technology to provide coverage." (<u>Id.</u> at ¶ 14.)

c.    The Board concluded that "the requested variances would substantially impair the intent and purpose of the Paramus Zone Plan and Zoning Ordinance, as both proposed locations have been specifically designated by the Borough for residential use.  The proposed use is prohibited." (Board Decision ¶ 14.)

d.    The Board concluded that Plaintiffs' applications for a variance under N.J.S.A. 40:55D-70(c) should be denied because "Applicants have failed to meet their burden of showing that the benefits of the proposed improvements would substantially outweigh any possible detriment.  The Board further finds that the Applicants have failed to demonstrate how the purposes of the MLUL would be advanced by this Application."  (Board Decision ¶ 15.)

e.    In addition to its findings common to both subsections (c) and (d), the Board made the following additional findings with respect to Plaintiffs' application for a use variance under subsection (d):

    i.    Visual Impact: "Applicants have further failed to demonstrate that at special reasons exist for the relief requested, as both sites are located within a residential zone and if located on either site, the facility would have a negative visual impact on nearby residences." (Board Decision ¶ 21.)

    ii.    Tower Collapse: "[T]he proposed monopole's close proximity to nearby residences presents serious safety issues.  During the course of the hearings, members of the public raised concerns regarding the possibility of the tower falling onto or near their homes."  (<u>Id.</u> at ¶ 22.)

    iii.    Ice Accumulation: "Area residents voiced further concerns regarding the possibility of ice accumulation on the tower during winter months and the danger of large pieces of ice falling to the ground."  (<u>Id.</u>)  "[T]hese safety concerns were not adequately addressed by the applicant, who proposed no measures to stop ice accumulation and falling ice."  (<u>Id.</u>)

f.    The Board concluded that Plaintiffs' applications for a use variance under N.J.S.A. 40:55D-70(d) should be denied, finding that "the site is not particularly suited for the proposed use, that variances cannot be granted without substantial detriment to the public good and that the project would

not promote the general welfare."  (Board Decision ¶ 23.)

## II.     STANDARD OF REVIEW

Review under 47 U.S.C. § 332(c)(7)(B)(i)(II) is de novo.  This section requires that a zoning board's denial of an application to construct a personal wireless service facility not have "the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II).  "[T]he statutory bar against regulatory prohibition is absolute, and does not anticipate any deference to local findings."  Cellular Telephone Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus, 197 F.3d 64, 71 (3d Cir. 1999) ("Ho-Ho-Kus").  Thus, the Court's inquiry will "not necessarily be limited to the record compiled by the state or local authority."  APT Pittsburgh Ltd. Partnership v. Penn Township Butler County of Pennsylvania, 196 F.3d 469, 475 (3d Cir. 1999) ("Penn Township").

Section 332(c)(7)(B)(iii) requires that the decision of the Board "be in writing and supported, by substantial evidence contained in a written record."  47 U.S.C. §  332(c)(7)(B)(iii).  Substantial evidence means "such evidence as a reasonable mind might accept as adequate to support a conclusion."  Ho-Ho-Kus, 197 F.3d at 71.  The Court must examine the record as a whole to determine if there is substantial evidence to support the challenged decision.  Id.  The Court may not weigh the evidence contained in the record or substitute its own conclusions for those of the Board.  Id.  However, if the record as a whole contains conflicting evidence, the Board "must adequately explain its reasons for rejecting or discrediting competent evidence."  Id.

Under New Jersey Law, a decision of a zoning board may be set aside only when it is "arbitrary, capricious or unreasonable."  Medici v. BPR Co., 526 A.2d 109, 116 (N.J. 1987).  The Court may not substitute its judgment as to the wisdom of the action, and "there can be no

judicial declaration of invalidity in the absence of clear abuse of discretion by the public agencies involved."  Id.  "So long as the power exists to do the act complained of and there is substantial evidence to support it, the judicial branch of the government cannot interfere."  Id.

## III.   DISCUSSION

### A.   Motion for Summary Judgment

### 1.   Legal Standard

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial.  Id. at 324.   In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).   Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings.  See Celotex, 477 U.S. at 324.  Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment.  See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).  The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

2.      **Effective Prohibition Claim**

Congress enacted the TCA in order to create "a pro-competitive, de-regulatory national policy framework designed to rapidly accelerate private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." Penn Township, 196 F.3d at 473 (quoting H.R. Conf. Rep. No. 104-458 (1996)). Section 332(c)(7) of the TCA "expressly preserves the traditional authority enjoyed by state and local government to regulate land use and zoning, but places several substantive and procedural limits upon that authority when it is exercised in relation to personal wireless service facilities." Id. Subsection 332(c)(7)(B)(i)(II) provides one such limitation, requiring that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). An individual adverse zoning decision violates subsection 332(c)(7)(B)(i)(II) of the TCA if the applicant demonstrates that (a) its proposed facility "will fill an existing significant gap in the ability of remote users to access the national telephone network," and (b) "the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve." Penn Township, 196 F.3d at 480.

a.  Significant Gap in Coverage

Until recently, it was well established within the Third Circuit that a "significant gap" in wireless coverage is measured from the user's perspective, rather than a particular provider's perspective. Thus, a "significant gap" in coverage could only be shown if there is a significant

gap in coverage for all wireless carriers, not just for the applicant carrier, in the area of the proposed facility.  See Nextel West Corp. v. Unity Township, 282 F.3d 257, 265 (3d Cir.2002) ("this prong focuses on whether any provider is covering the gap, instead of whether the gap exists only in, for example, Nextel's service.  A provider must 'include evidence that the area the new facility will serve is not already served by another provider.'") (quoting Penn Township, 196 F.3d at 480).  Under this interpretation, a Board's denial of carrier's application does not violate § 332(c)(7)(B)(i)(II) if another carrier is already providing service to the area.  Other Circuits, however, have rejected this approach.  See, e.g., Second Generation Properties, L.P. v. Town of Pelham, 313 F.3d 620, 633-34 (1st Cir. 2002) (rejecting a rule that "any service equals no effective prohibition"); MetroPCS, Inc. v. City and County of San Francisco, 400 F.3d 715, 731-33 (9th Cir. 2005) (adopting the First Circuit view).

In 2009, the Federal Communications Commission (FCC) issued a declaratory ruling to resolve this conflict among the Circuits.  The FCC explicitly rejected the Third Circuit approach, concluding that "a State or local government that denies an application for personal wireless service facilities siting solely because one or more carriers serve a given geographic market has engaged in unlawful regulation that 'prohibits or ha[s] the effect of prohibiting the provision of personal wireless services,' within the meaning of Section 332(c)(7)(B)(i)(II)."  In re Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B), 24 F.C.C.R. 13994, 14017 (2009) ("Declaratory Ruling") (quoting the statute).  The FCC concluded that "under the better reading of the statute, [§ 332(c)(7)(B)(i)(II)'s] limitation of State/local authority applies not just to the first carrier to enter into the market, but also to all subsequent entrants."  Id.  But, the FCC explained that "State and local authority to base zoning regulation on other grounds is left intact

by this ruling." Id.  Thus, the FCC held that a zoning board may not deny an application solely because another wireless carrier is already providing services to the geographic area in question, but, "where a *bona fide* local zoning concern, rather than the mere presence of other carriers, drives a zoning decision," the FCC's ruling is inapplicable and § 332(c)(7)(B)(i)(II) is not necessarily violated.  Id. at 14018 (emphasis in original).

The Third Circuit has recognized that "if a court of appeals interprets an ambiguous statute one way, and the agency charged with administering that statute subsequently interprets it another way, even that same court of appeals may not then ignore the agency's more recent interpretation." Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 502 (3d Cir. 2008) (citing Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 986 (2005)).  Here, the FCC interprets § 332(c)(7)(B)(i)(II) differently than the Third Circuit and declares the Third Circuit approach to be "inconsistent with the Telecommunications Act's pro-competitive purpose." Declaratory Ruling, 24 F.C.C.R. at 14016.  The Court finds no indication in the Third Circuit's opinions that its construction of § 332(c)(7)(B)(i)(II) "follow[ed] from the unambiguous terms of the statute," Brand X, 545 U.S. at 982, and neither party here contends that the statute is unambiguous with regard to this issue.  Thus, the Court concludes that, in light of the FCC's ruling, a "significant gap" in wireless coverage under the first prong of the Penn Township test may be established upon a showing of a significant gap in the coverage of the applicant carrier alone.  If a zoning board rejects an application based on a finding that another carrier is already providing service to the geographic area in which the applicant alleges a gap in its service, and that rejection is not otherwise supported by one or more bona fide local zoning concerns unrelated to the presence of other carriers, the board has violated § 332(c)(7)(B)(i)(II) of the

TCA.  Thus, to the extent that Defendant argues that coverage provided by wireless carriers other than Plaintiffs renders any gap in wireless coverage within the Borough not "significant," such arguments do not constitute genuine issues of material fact in this case.

Plaintiffs contend that signal strength data taken by their experts demonstrates a "significant gap" in Plaintiffs' wireless coverage within the Borough of Paramus.  Plaintiffs rely on the testimony of both its own experts and the independent expert hired by the Board, Ross Sorci, who testified at a Board meeting held in 2008 that there is a "real gap" in Plaintiffs' wireless service and that "[t]he methodology that [the Carriers] used to evaluate the service gap is pretty much the industry standard, it's the same methodology I've seen used by Sprint and Omnipoint at other locations, as well as other carriers."  (SOF ¶ 33, 35.)  Defendant does not seriously dispute that a gap exists in Plaintiffs' wireless services.  (See Def.'s Opp'n Br. 37-40 (focusing its arguments on the fact that Verizon and AT&T already provide wireless service within Plaintiffs' alleged coverage gap).)  Defendant's principal objection is that "Plaintiffs arbitrarily decided that any area in the Borough with a cellular signal below [-]85 dBm had insufficient coverage," contending that this threshold was nothing more than "company policy." (Id. at 36.)

Defendant cites to a New Jersey state decision for the proposition that signal levels below -75 dBm are not "objectively inadequate coverage."  Id.  In that case, the Appellate Division questioned a carrier's policy of using a signal strength threshold of -75 dBm as the basis for determining the existence a coverage gap.  New York SMSA Ltd. Partnership v. Board of Adjustment of Tp. of Middletown, 734 A.2d 826, 832 (N.J. Super. Ct. App. Div. 1999) (stating that the carrier was "not entitled to a variance simply because a signal level of -75 dBm is

desirable as a matter of company policy.")  Here, however, Plaintiffs used a threshold of -85 dBm, a signal strength ten times weaker[3] than that considered in <u>Middletown</u>.  Furthermore, just three years after the <u>Middletown</u> decision, the Appellate Division accepted expert testimony that the -85dBm threshold was "in compliance with general standards normally used by most of the companies."  <u>Sprint Spectrum, L.P. v. Borough of Upper Saddle River Zoning Bd. of Adjustment</u>, 801 A.2d 336, 357-58 (N.J. Super. Ct. App. Div. 2002).

Nonetheless, federal courts too have rejected testimony that -85 dBm has been adopted as an industry standard for reliable service.  In a recent case, the district court heard expert testimony on behalf the plaintiff carrier that "-85 dBm is the industry standard for reliable in-car coverage."  <u>New Cingular Wireless PCS, LLC v. Zoning Hearing Bd. of Weisenberg Tp.</u>, 2009 WL 3127756, at *3 (E.D. Pa. Sept. 29, 2009) ("<u>Weisenberg Township</u>").  The township board, however, presented its own expert testimony that "calls could be made, received and maintained while traveling through the Township in a car with a street level signal strength of -95 dbm."  The board's expert stressed that "-85 dBm has not been established as the standard for adequate or reliable coverage by any organization or standards body" but also explained that "in determining whether a signal strength of -95 dbm was adequate to make and maintain calls, it depends on the terrain of the area.  For example, in Manhattan, an area with tall buildings and deep canyons, -95 dbm would not provide an adequate signal."  <u>Id.</u> at *5 n.32.  In light of the expert testimony and the particular terrain of the township, the court concluded that the carrier failed to establish that the -85 dBm service criterion was an industry standard.

---

[3]Because decibel values are computed as logarithms scaled by a factor of ten, a "-75 dBm" signal is ten times stronger than a "-85 dBm" signal.

The question before the Court, however, is not whether Plaintiffs followed industry standard procedures but rather whether a "significant gap" in wireless coverage exists that Plaintiffs' proposed facility would fill.  The Court is persuaded that a significant gap exists here. Multiple experts testified that a gap in coverage exists, including one hired by the Board, who termed it to be "real gap."  (SOF ¶ 33.)  Experts testified that the gap covers several miles of a densely populated suburban community and that the gap adversely affected the call reception and quality of actual cellular devices used in the field.  Indeed, a Board member stated on the record that the question of whether a significant gap exists had "been answered."  (Id. at ¶ 37.)  Finally, the independent expert validated the methodology used by Plaintiffs to measure the gap, and to the extent that such methods reflect only "company policy," the Court notes, as did court in Weisenberg Township, that the particular terrain of a proposed site influences the required signal strength.  Here, Plaintiffs' monopole would be located in a valley dotted with tall trees, some "in excess of 70, 80 feet."  (Id. at ¶ 99.)  Thus, in light of the undisputed expert testimony regarding the existence and extent of the coverage gap and the particular facts of this case, the question of whether Plaintiffs' use of a -85 dBm signal strength threshold comported with industry standards does not constitute a genuine issue of material fact.  The Court concludes that a significant gap in Plaintiffs' wireless coverage exists within the area presented to the Board by Plaintiffs' experts.

The Court further concludes that either of Plaintiffs' proposed facilities would adequately fill the coverage gap.  Penn Township, 196 F.3d at 480.  As discussed below, Plaintiffs thoroughly analyzed alternative sites, and experts testified that a monopole located at either the Church of the Nazarene site or Ambulance Corps site would fill most of the measured gap in coverage.  (Id. at ¶ 46-53.)  Defendant disputes this, pointing to the testimony of Mr. Sorci that

neither of the proposed facilities would "completely fill the service gap" and that in the future another facility might need to be constructed near the southern edge of the coverage gap.  (Def.'s Opp'n Br. at 23.)  However, as Defendant itself states, "Plaintiffs are not entitled to optimal or 'seamless' coverage" under § 332(c)(7)(B)(i)(II).  (Id. at 36 (quoting Middletown).)   Indeed, Plaintiffs do no seek such coverage.  (See SOF ¶ 49 ("we're not always going to get every corner or every side street, that's not necessarily realistic[], but we're definitely trying to get the majority of the people.").)  In light of the undisputed expert testimony and the practical limitations presented by the proposed sites, the Court concludes that Plaintiffs' proposed monopole would adequately fill the coverage gap.

b.  Least Intrusive Means

The second prong of the Penn Township test analyzes whether "the manner in which applicant] proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve."  196 F.3d at 480.  This requires the applicant to show that "a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc."  Id.

At the Board meetings, Plaintiffs presented evidence that they considered numerous sites in and around the coverage gap before arriving at the Church of the Nazarene and Ambulance Corps as their favored sites.  The independent expert, Ross Sorci, testified that "[t]he applicant has looked at numerous alternative locations, they've evaluated them and rejected them for various reasons," describing that "the building rooftop heights, the ground elevation of the site or just the location of it, really do not lend themselves as a viable alternative, so we keep coming

back to the location where we're at." (SOF ¶ 59.)  Plaintiffs presented twenty-seven alternative

sites that they had evaluated.  (Id. at  ¶ 55; Pls.' Br. Ex. L.)  Indeed, with respect to proposed

monopole design, Defendant does not dispute that Plaintiffs adequately considered alternative

sites before arriving at the proposed sites.

      Defendant does dispute, however, that Plaintiffs adequately considered technological

alternatives to its proposed monopole.  Defendant argues that a Distributed Antenna System

(DAS) would provide a less intrusive alternative to the monopole system proposed by Plaintiffs.

Defendant contends that Plaintiffs failed to adequately consider the DAS as an alternative to its

proposed monopole and that the DAS is less intrusive than a monopole on the values that the

Board's denial sought to serve.  Defendant lists those values as the "protection of residential

zones from intrusive monopoles and preservation of light, air, and open space in such residential

zones."  (Def.'s Opp'n Br. 42.)  Defendant relies on the testimony of David Maxson, the expert

hired by the public advocate.  In his written report, Mr. Maxson refuted the testimonies of Mr.

Gordon and Mr. Sorci that a DAS using multiple, smaller antennae would not adequately fill

Plaintiffs' coverage gap.  (SOF ¶ 111-116.)   Plaintiff, however, presented another expert, Glenn

Pierson, to refute Mr. Maxson's assertions.  Mr. Pierson testified that the DAS was inferior to the

monopole design in terms of its reliability, maintainability, ability to be optimized for multiple

carriers, cost, and ability to geographically locate users in support of emergency services.  (SOF ¶

118-131.)  Plaintiffs also dispute the credibility of Mr. Maxson as an expert, citing his lack of

formal training in engineering.  (Pls.' Br. 12.)

      In light of this conflicting testimony, the Court concludes that genuine issues of material

fact exist as to the feasibility of the DAS as a less intrusive alternative to Plaintiffs' proposed

monopole.  While the testimony of the experts does shed light on the technical details associated with the DAS, it does not conclusively resolve the question of the feasibility of implementing DAS here, as the testimony regarding its relative reliability, safety, and other design considerations is conflicting, and the credibility of the witnesses as experts is in issue.  Indeed, Plaintiffs themselves state that an analysis under <u>Penn Township</u> "must take into account whether the [DAS] alternative is similarly reliable, feasible, and capable of meeting safety and implementation concerns."  (Pls.'s Reply Br. 14.)  At summary judgment the Court may not engage in the weighing of evidence.  <u>Reedy v. Evanson</u>, 615 F.3d 197, 210 (3d Cir. 2010).  Thus, based on the evidence before the Court, the question of whether the DAS is a feasible, less intrusive alternative to the proposed monopole presents genuine issues of material fact.

Perhaps recognizing the inherently factual nature of this determination, Plaintiffs argue that the Board's denial of its application based on a failure to adequately consider an alternative system design is both preempted under federal law and constitutes a barrier to market entry under § 332(c)(3)(A).  As to preemption, Plaintiffs argue that the Board's denial of its application "treads upon the federal government's exclusive authority over technical matters related to radio broadcasting."  (Pls.' Br. 29.)  In reaching this conclusion, Plaintiffs frame the Board's denial as having effectively mandated the use of a DAS.  (<u>See, e.g.</u>, <u>id.</u> at 29, 30 n.9.)  Defendant, however, rightly points out that the Board merely "found a DAS to be a less intrusive alternative to a monopole."  (Def.'s Opp'n Br. 42.)  The Board did not mandate the DAS, but rather reached a conclusion as to the intrusiveness of the DAS compared to the proposed monopole.  The TCA already provides mechanisms by which a court can review the denial of a zoning variance application, and Plaintiffs cannot re-characterize the Board's denial here in order to circumvent

these mechanisms.  As such, Plaintiff's preemption claim must fail.

Plaintiffs further argue that "requiring" the carriers to use DAS technology violates the TCA's market entry provision.  That provision provides that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service . . ., except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services any commercial mobile service." 47 U.S.C. § 332(c)(3)(A).  This argument, however, rests upon the same mischaracterization of the Board's decision as Plaintiffs' preemption argument.  The Board in no way regulated the "entry" of Plaintiffs into the Paramus market by "requiring" the use of any particular technology.  The carriers already operated in that market, see SOF ¶ 30, and the Board's denial cannot be construed as a mandate.  Plaintiffs' claim under § 332(c)(3)(A) thus fails as well.

Based on the foregoing, summary judgment on Plaintiffs' claim under § 332(c)(7)(B)(i)(II) is granted in part and denied in part, as no genuine issue of material fact exists regarding the significant gap in Plaintiff's wireless coverage, but genuine issues of material fact do exist regarding the feasibility of DAS as a less intrusive alternative to Plaintiffs' proposed monopole.  Summary judgment on Plaintiffs' preemption and market entry claims is denied.

**3.     Substantial Evidence Claim**

When considering a claim under § 332(c)(7)(B)(iii), "[t]he reviewing court's task is to determine whether the decision, as guided by local law, is supported by substantial evidence." Ho-Ho-Kus, 197 F.3d at 72.  Under the New Jersey MLUL, a decision of a zoning board may be set aside only when it is "arbitrary, capricious or unreasonable," but "[s]o long as the power

exists to do the act complained of and there is substantial evidence to support it, the judicial branch of the government cannot interfere."  Medici v. BPR Co., 526 A.2d 109, 116 (N.J. 1987). Thus, both § 332(c)(7)(B)(iii) and New Jersey law employ the substantial evidence standard. Cellular Telephone Co. v. Zoning Bd. of Adjustment of the Borough of Harrington Park, 90 F. Supp. 2d 557, 563 n.5 (D.N.J. 2000).

When an applicant requests a dimensional variance under N.J.S.A. 40:55D-70(c), the applicant must show that the purposes of the statute "would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment."  N.J.S.A. 40:55D-70(c).  "[T]he fact that a proposed use is an inherently beneficial use shall not be dispositive of a decision on a variance under this subsection."  Id. The New Jersey Supreme Court has declined to declare monopoles to be inherently beneficial uses.  Smart SMR of New York v. Borough of Fair Lawn Bd. of Adjustment, 704 A.2d 1271, 1278 (N.J. 1998) ("Fair Lawn").

When an applicant requests a use variance under N.J.S.A. 40:55D-70(d), "local zoning officials must weigh the positive and negative factors associated with a requested zoning variance and determine whether, on balance, those factors weigh in favor of granting or rejecting the request."  N.J.S.A. 40:55D-70(d).  To satisfy the positive criteria, the applicant must show that the use "promotes the general welfare because the proposed site is particularly suitable for the proposed use."  Medici, 526 A.2d at110.  "Generally, the issuance of an FCC license should suffice for a carrier to establish that the use serves the general welfare."  Fair Lawn, 704 A.2d at 1285.  When a proposed use is inherently beneficial, the positive criteria are presumptively satisfied.  Id. at 1278.  While the New Jersey Supreme Court declined to declare monopoles to be

inherently beneficial uses, it did state that "[a] commercial use serves the general welfare and thereby satisfies the positive criteria if the use is particularly suited for the proposed site." Id. To satisfy the negative criteria, the applicant must show that the variance can be granted "without substantial detriment to the public good." Id. When a proposed use in not inherently beneficial, the negative criteria are only satisfied if the applicant "demonstrate[s] through 'an enhanced quality of proof . . . that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance.'" Id. (quoting Medici, 526 A.2d at 119).

Plaintiffs contend that the Board failed to consider the positive criteria in its analysis. Nonetheless, Plaintiffs concede that the Board's decision states that the carriers are licensed by the FCC, a fact which "generally" establishes the positive criteria under New Jersey Law. Fair Lawn, 704 A.2d at 1285. In its analysis, the Board cites to Fair Lawn for the proposition that "a monopole is not an inherently beneficial use" and proceeds to analyze whether "special reasons" exist to grant Plaintiffs' application. (Board Decision ¶ 20; see Fair Lawn, 704 A.2d at 1278 ("To resolve the present appeal . . . we need not declare [monopoles] to be inherently beneficial uses").) While the Board's reading of Fair Lawn may have been overly narrow, it cannot be said, as Plaintiffs contend, that the Board failed altogether to the consider the positive criteria. Indeed, the Board's analysis of "special reasons" to grant the requested variances echoes Fair Lawn's requirement that a telecommunications facility be "particularly suited for the proposed site." The Board thus at least considered the positive criteria.

The Board made three basic findings of negative criteria to support its conclusion that the purposes of the MLUL would not be advanced by Plaintiffs' applications and that the benefits of the variances would not "substantially outweigh any detriment." (Board Decision ¶ 10, 21.) The

Board applied these findings to both the use variance and the dimensional variance sought by

Plaintiffs.  See p.9, supra, at n.2.  The Board found (1) that the monopole would have a

"detrimental visual effect" on the neighboring properties, (2) that Plaintiffs failed to "present

sufficient evidence that the area is not being served adequately by another wireless carrier," and

(3) that Plaintiffs "failed to investigate less intrusive ways of providing coverage" and "did not

put forth a good faith effort to explore and investigate alternative technology."  (Board Decision

¶ 11-14.)

Under New Jersey law, a zoning board may deny a variance to construct a monopole

based on aesthetics, but its reasoning must be supported by substantial evidence.  Omnipoint

Corp. v. Zoning Hearing Bd. of Pine Grove Tp., 181 F.3d 403, 408 (3d Cir. 1999), Northeast

Towers v. Zoning Bd. of Adjustment of Borough of West Paterson, 744 A.2d 190, 202 (N.J.

Super. Ct. App. Div. 2000).  "A few generalized expressions of concern with 'aesthetics' cannot

serve as substantial evidence."  Pine Grove, 181 F.3d at 409 (quoting Cellular Telephone Co. v.

Town of Oyster Bay, 166 F.3d 490, 496 (2d Cir.1999)).  Here the Board's decision merely states

that "the substantial height of the proposed monopole and its placement within a residential

neighborhood would have a detrimental visual effect on the surrounding properties." (Board

Decision ¶ 11.)  The Board describes the overall size and physical characteristics of the proposed

facility but does not specify the extent to which the "visual effect" of the proposed monopole

would actually impact neighboring properties.  No specific objections from the public or Board

members are cited.  Thus, the Board's decision provides only "generalized" concerns regarding

aesthetics, which are not supported by substantial evidence.

The Board's decision also relies on Plaintiffs' failure to "present sufficient evidence that

the area is not being served adequately by another wireless carrier." (Id. at ¶ 12.)  When the

Board's decision was issued in August 2009, the law of the Third Circuit required that under §

332(c)(7)(B)(i)(II) a significant gap in coverage be demonstrated for all wireless carriers, not just

for the applicant carrier, in the area of the proposed facility.  As already discussed, that rule

changed in November 2009 when the FCC issued its declaratory ruling holding that a zoning

board violates § 332(c)(7)(B)(i)(II) when it denies an application solely because another wireless

carrier is already providing services to the geographic area in question. See Thorpe v. Housing

Authority of City of Durham, 393 U.S. 268, 282 (1969) (holding that the rule that the court must

apply the law in effect at time it renders its decision "applies with equal force where the change

is made by an administrative agency acting pursuant to legislative authorization").  While the

FCC's ruling focused on the § 332(c)(7)(B)(i)(II) effective prohibition analysis, it nevertheless

impacts the substantial evidence analysis under § 332(c)(7)(B)(iii) and New Jersey law, as local

zoning boards are now prohibited from denying applications solely because other carriers operate

within the area.  Thus, to the extent that the Board here relied on Plaintiffs' failure to present

sufficient evidence that other carriers did not already serve the area, such grounds cannot provide

the sole basis for its decision, and thus cannot alone constitute substantial evidence.

The Board's final common ground for denying Plaintiffs' variance requests relies on

findings that Plaintiffs failed to "investigate less intrusive ways of providing coverage" and "did

not put forth a good faith effort to explore and investigate alternative technology to provide

coverage."  (Board Decision ¶ 13-14.)  The Court has already held that genuine issues of material

fact exist as to whether the DAS presented a feasible alternative to the monopole proposed by

Plaintiffs.  Likewise, if the DAS were not a feasible alternative to the monopole, a failure to

"explore and investigate" it as an alternative, less intrusive means of providing coverage would not constitute substantial evidence upon which the Board could have based its decision.  Sprint Spectrum v. Zoning Hearing Bd. of Tp. of Haverford, 2007 WL 1101270, *6 (E.D. Pa. Apr. 10, 2007).  Thus, the determination of whether the Board's findings here were supported by substantial evidence under § 332(c)(7)(B)(iii) and New Jersey law depends on the resolution of the same factual issues upon which the § 332(c)(7)(B)(i)(II) analysis depends.

In addition to the three findings that the Board applied to both variances, the Board cited further evidence to support its denial of the use variance requested under N.J.S.A. 40:55-70(d). Specifically, the Board cited as safety issues "the possibility of the tower falling onto or near [residents'] homes, since its proposed distance from their homes is less that its height," and "the possibility of ice accumulation on the tower during winter months" creating "the danger of large pieces of ice falling to the ground."  (Id. at ¶ 22.)  These concerns are not supported by substantial evidence in the record.

As to the possible collapse of the monopole, experts testified that such failures were "quite rare," with one expert testifying as to having known of only two such occurrences among "thousands and thousands" of facilities.  (SOF ¶ 68, 70.)  Furthermore, it is undisputed that no residence is located within 120 feet of the monopole, which would stand approximately 120 feet high.  (Id. at ¶ 71.)  Thus, there is no evidence in the record that the tower posed a realistic threat of collapse, and even if such a collapse were to occur, there is no evidence that it would fall "onto or near [residents'] homes."

The Board's concerns regarding "ice accumulation" are equally unfounded.  If no residence is located within 120 feet of the monopole, the Board provides no explanation as to

how ice accumulating on its less than six-foot antennae could reasonably be expected to endanger potential passersby who are already prevented by a fence from entering the area near the monopole.  (Id. at ¶ 83-86.)  The Board admonishes Plaintiffs for having proposed "no measures to stop ice accumulation and falling ice" but points to no evidence that the likelihood of injury due to falling ice amounts to more than a mere "possibility."  (Board Decision ¶ 22.)  Speculative concerns unsupported by demonstrable facts do not provide substantial evidence upon which a denial can be based.  Pine Grove, 181 F.3d at 409.  The Board's conclusions regarding tower collapse and falling ice are therefore not supported by substantial evidence.

The findings made by the Board with respect to visual effect and safety are not supported by substantial evidence.  As the Board's decision may not rest solely on the presence of other carriers, the question of whether the Board's denial of Plaintiffs' application was supported by substantial evidence turns on the resolution of genuine issues of material fact regarding the feasibility of the DAS as an alternative to the proposed monopole.  As such, Plaintiffs' motion for summary judgment on claims under § 332(c)(7)(B)(iii) and New Jersey law is denied.

**4.      Reasonable Time**

The TCA requires that local regulators act upon placement, construction, and modification applications "within a reasonable period of time after the request is duly filed . . ., taking into account the nature and scope of such request."  47 U.S.C. § 332(c)(7)(B)(ii).  Under the New Jersey MLUL, default judgment may be entered in favor of the applicant if the Board does not render a decision within 120 days of the applicant's original request.  N.J.S.A. 40:55D-73(b).  The Board must then memorialize its decision in a resolution within forty-five days of its decision.  N.J.S.A. 40:55D-10(g)(2).  However, an objection under § 332(c)(7)(B)(ii) is waived if

the applicant consents to the extension of time.  See Cellular Telephone Co. v. Zoning Bd. of Adjustment of Borough of Ho-Ho-Kus, 24 F. Supp. 2d 359, 365 (D.N.J. 1998) (holding that the zoning board acted within a reasonable period of time on a telecommunications company who "consented to extensions of time" over a period of two and one-half years and forty-four hearings).

Plaintiffs complain that the Board took over five years and seventeen hearings to reach a decision regarding its application.  Plaintiffs point to Board's permission of "repetitive, irrelevant testimony from the same handful of Borough residents" and its allowing "months [to pass] between hearings because of the Board's scheduling conflicts."  (Pls.' Br. 36 n.14.)  Defendant, however, rightly points out that zoning board meetings are by nature open to the public, and Plaintiffs themselves freely admit that they too "had some scheduling conflicts that accounted for delays."  Id.  Plaintiffs' principal objection appears to focus on the hiring of the public advocate. Plaintiffs state, "And just as the Board was about to issue a decision in late 2008—over four years after the original application was filed—the Board permitted the newly hired public advocate additional time to retain an expert and develop his case."  Id.  The record, however, completes the story.

At a Board meeting held August 28, 2008, a question was posed by a member of the public regarding the delay in resolution of Plaintiffs' application under the MLUL, "The 120 days, what happens with that? They haven't completed their –."  (Tr. of Zoning Board Hr'g Aug. 28, 2008, 16:8-15.)  The Board's chairman replied, "Doesn't make any difference. [Plaintiffs] signed a waiver . . . .  The time is extended every time we have a meeting."  (Id.)  Then, at the November 13, 2008 hearing, the public advocate requested additional time to retain an expert in radio

Page 29 of  31

frequency engineering.  (Tr. of Zoning Board Hr'g Nov. 13, 2009, 59:19-60:4.)  Counsel for Plaintiffs argued to the Board that an extension would be "unfair to the applicant," id. at 61:5-11, but ultimately agreed to adjourn until the February 12, 2009 hearing.  (Id. at 67:15-68:13.)  While the Board's hiring of the public advocate did come over four years after the filing of the application for the Ambulance Corps site, it occurred only one year after the filing of the application for the Church of the Nazarene site, and Plaintiffs consented to extensions of time both before and after the public advocate was hired.  Thus, considering the "nature and scope" of Plaintiffs' applications and their attorney's repeated consents to extensions of time, the Court finds no unreasonable delay on the part of the Board.  Plaintiffs' motion for summary judgment under § 332(c)(7)(B)(ii) is therefore denied.

**B.    Motion to Strike**

Defendant moves to strike all or portions of Plaintiffs' Response to Defendant's Supplemental Statement of Facts ("RDSSF") on the ground it contains legal arguments in violation of Local Rule of Civil Procedure 56.1.  Defendant also moves to strike two paragraphs of Plaintiffs' reply brief on the ground that it raises arguments not contained in Plaintiffs' initial brief in support of its Motion for Summary Judgment.

Defendants' motion to strike portions of the RDSSF is granted to the extent that it asserts legal arguments.  See Rodichok v. Limitorque Corp., 1997 WL 392535, at *1 n.1 (D.N.J. 1997).  The Court notes that, in any event, it would not consider bona fide arguments advanced in a statement of facts, as the purpose of these statements is to narrow the issues before the Court, L. Civ. R. 56.1, comment 2, and arguments inserted therein accomplish the opposite.

Defendant's motion to strike portions of Plaintiffs' reply brief is granted to the

extent that Plaintiffs raise legal arguments not presented by their brief in support of their motion for summary judgment.  See Bayer AG v. Schein Pharmaceutical, 129 F.Supp.2d 705, 716 (D.N.J. 2001).  In their reply brief, Plaintiffs devote two paragraphs to arguing that the Borough of Paramus's Wireless Ordinance created a "defacto policy" of effective prohibition of wireless services under the TCA.  (Pls.' Reply Br. 4-5.)  Plaintiffs, however, explain that they did not intend the paragraphs to make any new claims with respect to the Wireless Ordinance.  (Pls' Opp'n to Def.'s Mot. to Strike 7.)  Defendant's motion is thus granted only to the extent that Plaintiffs assert that the Wireless Ordinance itself violates the TCA.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted in part and denied in part, and Defendant's motion to strike is granted.  An appropriate Order accompanies this Opinion.


DATED: November 22, 2010                    /s/ Jose L. Linares
                                            JOSE L. LINARES
                                            UNITED STATES DISTRICT JUDGE